*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* WALDRON, Minors.

UNPUBLISHED
September 15, 2022

No. 360341
St. Joseph Circuit Court
Family Division
LC No. 2020-000686-NA

Before: MURRAY, P.J., and O'BRIEN and REDFORD, JJ.

PER CURIAM.

Respondent appeals as of right the order terminating his parental rights to the minor children under MCL 712A.19b(3)(j) (reasonable likelihood that children would be harmed if returned to parent's care). On appeal, respondent argues that the trial court impermissibly terminated his parental rights solely on the basis of his present incarceration. We disagree and affirm.

## I. BACKGROUND

Petitioner initiated this case by filing a petition on October 9, 2020, in which it requested the removal of the children BW, EW, LW, SW, and AW from the home of the children's mother, Mercedes Flores, with whom they were living.[1] Respondent was incarcerated at the time. The petition alleged that, prior to his incarceration, respondent lacked stable housing, having been kicked out of multiple homes due to his behavior. The petition also stated that Flores had reported that respondent was an alcoholic and abusive towards Flores, including an incident in 2019 when he threw a pregnant Flores down a flight of stairs.

Due to respondent's incarceration, the factual basis for the petition pertained almost exclusively to Flores, namely her failure to properly supervise the children. The petition alleged that on August 15, 2020, police responded to a call and found BW, EW, and LW playing alone by the side of the road while Flores was asleep at home. Flores was charged with fourth-degree child

---

[1] Flores was a respondent below and her parental rights were also terminated, but she has not appealed.

abuse for the incident. The petition also alleged that on September 23, 2020, during an unannounced home visit, the children were found awake in the living room, unsupervised, and SW answered the door and said that Flores would not wake up. Flores eventually came to the door, but would not let petitioner into the home. Petitioner asked Flores to take a drug test, and it came back positive for methamphetamine. The petition also alleged that on September 30, 2020, SW was found alone outside at 6:30 a.m. waiting for the bus wearing only a pajama shirt, and shorts, with no shoes. The home was dark, and SW appeared to be the only one awake. Lastly, the petition alleged that on October 1, 2020, Flores allowed petitioner to view the home, and petitioner observed that there was no working electricity or heat (though a kerosene heater was observed in the living room), no running water, and there was little food. Flores took a drug screen, and it tested positive for methamphetamine and marijuana. On the basis of these incidents, the petition alleged that the children's home was unfit due to neglect, cruelty, drunkenness, criminality, or depravity, and asked the trial court to order the children removed from the home.

The children were removed by way of an ex parte order the day before the petition was filed. The order stated that it was contrary to the children's welfare to be left in Flores's care because the children were frequently left alone unsupervised, the home lacked electricity and food, and Flores admitted to illicit drug use. The order placed the children under the care and supervision of the Department of Health and Human Services (DHHS).

A preliminary hearing was held the same day that the petition was filed—October 9, 2020. Respondent was not at this hearing, but Flores was. Following the hearing, the court ordered that it was contrary to the welfare of the children to remain in Flores's home for the reasons specified in the previously entered ex parte order. The order noted that the children were not all in the same placement due to the number of children.

A second preliminary hearing was held on November 5, 2020, and respondent was in attendance. Respondent denied the allegations in the petition, and therefore the matter was set for trial.

The court held several more hearings, but respondent did not attend those due to apparent difficulties with the prison he was housed in. The first hearing he was able to attend again was on June 24, 2021. At that hearing, respondent withdrew his request for a trial and admitted to certain allegations in the petition. Respondent testified that he was currently in prison, and that he had been in prison since his arrest on May 8, 2020. Before his arrest, he did not have custody of the children because he lacked stable housing and was dealing with substance abuse issues. On the basis of respondent's admissions, the trial court took jurisdiction over the children. An order of adjudication was signed the same day. An order of disposition was also signed that day, and it ordered respondent to attend and participate in any services available while incarcerated.

Eventually, when progress in the case was seemingly stalling, petitioner requested that the goal be changed from reunification to adoption, and the trial court granted the request. Accordingly, on October 27, 2021, petitioner filed a petition to terminate respondent's parental rights. The petition requested termination of respondent's parental rights under MCL 712a.19b(3)(g) and (j).

Trial on this petition commenced on January 5, 2022. Susan Pennock, the foster care worker for the children, testified that the children were in foster care and were doing well in their placements. Pennock noted that the children were not all placed together because they did not have a foster home or an appropriate relative who could take all five children; the five children were divided into two separate placements. SW, EW, and BW were placed together. All three were in counseling, and all had been diagnosed with PTSD and anxiety "related to the trauma in their life." Pennock explained that the "trauma" that the children experienced referred to "the instability of them being left and found alone, multiple times . . . without proper supervision." It also referred to "physical abuse" and the children's "overall anxiety" of their needs not being met, including insufficient housing and utilities. According to Pennock, SW, EW, and BW were showing improvement in their placement through consistency.

Pennock testified that LW and AW were likewise doing well in their placement. They were also in counseling. Pennock said that, while AW and LW were "becom[ing] more stable," they were having difficulty in school, which was being addressed. AW had also been diagnosed with Tourette Syndrome. Pennock explained that, with AW's and LW's issues, a parent needed "to be able to understand trauma" and "be a consistent, sober parent in order to safely parent [the children], and to ensure that all of their needs are being met." Pennock testified that all of the children were in pre-adoptive placements, and that the placements scheduled sibling visits for the five to be together once a month.

Pennock testified that respondent had been incarcerated throughout the case, and his earliest release date was September 7, 2023. Pennock testified that, prior to his incarceration, respondent did not have stable housing—he was in and out of homeless shelters "living house to house." He also did not have consistent employment. Both of these issues concerned Pennock because the children needed structure, and respondent had not shown an ability to even meet "just their basic needs."

Pennock further testified that while he was incarcerated, respondent had completed a substance abuse treatment program. Pennock, however, could not say whether respondent had benefited from the program because "you have inherent compliance when you are incarcerated." Pennock also testified that, shortly before trial, respondent had enrolled in a "parenting type course" provided at the prison. Pennock noted, however, that she had first encouraged respondent to enroll in the course when she found out about it in May 2021, and that she had not heard about respondent's efforts to enroll until August 2021, at which time respondent told Pennock that his enrollment in the parenting course "was denied because it conflicted with his substance abuse course." Pennock emphasized that it was important for respondent to participate in a parenting course because he needed to learn the skills necessary to safely parent the children. Pennock said that this was especially true for the children in this case because they had "been significantly traumatized by their past" and respondent needed to be able to understand how to keep them safe and secure. Similarly, Pennock testified that it was important for respondent to participate in mental health treatment—which Pennock noted was unavailable to respondent in prison—because respondent needed to have coping skills to maintain stability for himself and the children. Due to the lack of resources available to respondent while incarcerated, Pennock testified that if respondent's rights were not terminated, she would still not recommend reunification until at least several months after respondent was released and he demonstrated that he was able to remain sober and participate in services.

Pennock testified that respondent had been communicating with the children through monthly letters. Pennock agreed that all of respondent's letters were appropriate. Despite these letters, SW, EW, and BW's therapist told Pennock that the children did not have "any type of emotional connection" to respondent—they rarely talked about him, and they "reported concerns with physical abuse while in his care."

Brooke Thomas, one of the foster parents to SW, BW, and EW, testified that those children had been in her care for 15 months. According to Thomas, when the children came into her care, "they were very withdrawn, malnourished, and fearful," but "today, they are thriving. They are growing. They are in school. They are in counseling. And they are doing extracurriculars, and they are doing amazing things." Thomas explained that the children had a good schedule and routine, received medical care, and had a good support system between herself, her husband, their biological children, and the foster placement's family and friends.

Thomas confirmed that all three children in her care have PTSD, and all share "similar fears of being removed from the home they are in now, losing the ground that they've made, food, bedding, clothing," and things of that nature. Thomas also testified that all three children had to have significant dental work done. BW's was particularly bad—he had to go to a hospital for the dental work to be done. SW's dental work was divided into three "rounds" because it was "so severe that they couldn't do it all at once."

Thomas testified that the children do not ask about either parent, but when they talk about their parents, "[t]hey do not share any good memories about their father." Thomas said that EW rarely spoke about respondent, but she did tell stories about respondent "smacking the children." All three children expressed fear of respondent. Thomas testified that BW, in particular, had night terrors about "being removed and stolen from the home and not having a safe place to be." Thomas said that SW similarly expressed fear about leaving the foster home, that she feared going "back to her former life, that it would just go back to how it used to be . . . ." According to Thomas, when the children receive the letters that respondent writes, they do not engage with the letters— EW and BW will walk away when Thomas reads them the letters, and SW will listen, but "she doesn't actually retain that we've even read letters to her."

Respondent testified that his current release date was September 7, 2023, but he was eligible to have that reduced by another 8.5 months, which meant he could be released as soon as January 2023. Respondent had been incarcerated since May 8, 2020. Respondent testified that he had a job lined up with his father upon his release from prison, and that he had "multiple" other opportunities "just due to Covid and nobody wanting to work." He conceded that housing may be an issue until he could save up enough "money for first month's rent down and deposit." He also conceded that he did not have a car or a license, but thought that he would be able to quickly buy a "cheap car" and get his license.

Respondent testified that he was incarcerated for burglary, but when asked for specifics about the crime, he said he could not remember because he was so intoxicated at the time of the incident. He said that he "wasn't aware" that he was incarcerated until he woke up the next day. He said he was intoxicated with alcohol. Respondent testified that, before he was incarcerated, he was struggling with addiction. He was not involved with Flores or the children at that time because he was living in Indiana while Flores was going back and forth between Michigan and Ohio, and

respondent lacked transportation. He said that, "[h]alf the time," he "didn't even know where" the children were. Respondent denied that he ever hit the children, and said that "they might be confused." He also said that he was "not the one that did it," and agreed that the children were liars when asked.

Following the hearing, the trial court issued an oral ruling. The court first noted respondent's admissions at the adjudication hearing that, before his May 8, 2020 arrest, he could not provide proper care and custody of the children because he lacked stable housing and struggled with substance abuse. The court then turned its focus to the children. It noted the children's ages—ranging from five years old to ten years old—and found that, based on the evidence presented at trial, all the children had experienced "complex trauma throughout the time that they lived with their parents." The court further found that, as a result of the parents' neglect and abuse, all the children suffered from ongoing issues, including PTSD and anxiety problems. The court also noted evidence demonstrating that, since removal, the children had made significant progress, and had shown improvements in their mental health, stability, and overall development. The court then pointed to other evidence suggesting that these improvements could only be sustained through positive, long-term "structure, routine, clear expectations, love, support, and stability." The court believed that the foster placements could provide this, and said that it was "very fortunate that these children have both landed in these specialized foster homes where they have landed. They have thrived."

Turning to respondent, the court noted that respondent's earliest release date was, at the time of trial, September 7, 2023, but respondent had represented that he could be released as soon as January 2023, which was one year from the time of trial. The court credited respondent for participating in substance abuse classes while in prison, and acknowledged that he could complete "only so many things" while incarcerated. The court also acknowledged respondent's desire to participate in parenting classes. But the court found that respondent's availability for the children was "a long ways" away, the earliest being one year from trial.

Turning to the statutory grounds, the court found that petitioner had failed to establish grounds for termination under MCL 712a.19b(3)(g) because, being incarcerated, respondent was not financially able to provide proper care and custody for the children. Nevertheless, the court found that petitioner had established grounds for termination under MCL 712a.19b(3)(j). The court noted that this subsection looks at both potential physical and emotional harm to the children. The court began by reiterating that the children "have experienced complex trauma" while in Flores's and respondent's care. The court noted the testimony that at least SW, EW, and BW had "continuing fears and terror of being returned to parent's care." The court credited the children's statements that they were physically abused by respondent. The court ultimately concluded that, based on the evidence of the harm that the children had suffered while in respondent's care and their fear of returning to respondent's care, the children would likely be emotionally damaged if returned to respondent's care.

The court then found that termination was in the children's best interests,[2] and terminated respondent's parental rights. This appeal followed.

## II. STANDARD OF REVIEW

On appeal, respondent argues that the trial court erred by terminating his parental rights under MCL 712a.19b(3)(j). We disagree.

This Court "review[s] for clear error a trial court's finding of whether a statutory ground for termination has been proven by clear and convincing evidence." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). A finding is clearly erroneous if the reviewing court is left with the firm and definite conviction that a mistake was made. *In re JK*, 468 Mich 202, 209-210; 661 NW2d 216 (2003).

## III. ANALYSIS

MCL 712A.19b(3)(j) states that a "court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence," that "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." The harm contemplated by MCL 712A.19b(3)(j) is not only physical but also emotional harm. *In re Hudson*, 294 Mich App 261, 268; 817 NW2d 115 (2011).

The trial court found that petitioner had established MCL 712A.19b(3)(j) by clear and convincing evidence based on petitioner's evidence about the emotional damage respondent's conduct had already wreaked on the children, and its conclusion that this harm was reasonably likely to reoccur if returned to his care.

When the children were taken into custody, respondent was in prison, and the children were residing with Flores. Yet respondent testified that, even before he was imprisoned, the children were living with Flores while he turned to drugs and alcohol. Nothing in the record suggests that he provided any support for the children during this time. He said that "[h]alf the time," he "didn't even know where" the children were. Before that, however, the children were in his and Flores's care, before they got "evicted" from respondent's mother's house.

After the children came into petitioner's care and custody, it became apparent that, during the time that they were in Flores's and respondent's care, they experienced significant trauma. They all needed counseling, and three of the children were diagnosed with PTSD. The children expressed significant fears about returning to respondent's care, and the youngest even had night terrors about it. A number of the children told their foster placements that respondent had physically abused the children, a claim that the trial court credited, despite respondent's testimony that the children were lying. See *In re Fried*, 266 Mich App 535, 541; 702 NW2d 192 (2005) (explaining that this Court gives deference to the trial court's superior position to judge the

---

[2] The court provided a lengthy explanation for its finding that termination of respondent's parental rights was in the children's best interests, but we need not elaborate on that finding because it is not disputed on appeal.

credibility of witnesses). The children also had no emotional connection to respondent, and of the three youngest, two would walk away when respondent's letters were read to them, and the third would listen but not "actually retain" what was read. Aside from their emotional trauma, the children had significant medical needs that were not being met while they were in Flores's and respondent's care. The oldest was diagnosed with Tourette Syndrome and was finally getting treatment for that. SW needed extensive dental work, so much so that she had to be subjected to "three rounds" of dental treatment to address it. Similarly, BW needed such extensive dental work that he had to have the procedure performed in a hospital.

While respondent had made progress in the case while in prison, the trial court nevertheless concluded that there was a reasonable likelihood, based on respondent's past conduct, that the children would be subjected to emotional harm if returned to respondent's care. The emotional harm that the children had suffered due to respondent's past conduct was not readily apparent when the children first came into the care and custody of the DHHS; the harm revealed itself over time as the children opened up to their caretakers and counselors about their time with respondent. We conclude that the trial court's finding was not clearly erroneous given the extensive trauma that the children had already suffered in respondent's care and the lifelong implications of that trauma (such as the need for ongoing counseling), as well as, particularly, the fact that the children expressed considerable fear at the mere thought of returning to respondent's care.

Respondent contends that this case is similar to *In re Mason*, 486 Mich 142, 161; 782 NW2d 747 (2010), in which our Supreme Court declared, "The mere present inability to personally care for one's children as a result of incarceration does not constitute grounds for termination." In that case, the respondent had provided for the children before his incarceration, had complied with his case-service plan as best he could while incarcerated, and the children had been placed with respondent's relatives when removed. *Id*. at 147-149. Relevant to this case, the *In re Mason* Court explained why the facts of that case did not support termination under MCL 712A.19b(3)(j):

> Termination on this ground was clearly erroneous because no evidence showed that the children would be harmed if they lived with respondent upon his release. Significantly, just as incarceration alone does not constitute grounds for termination, a criminal history alone does not justify termination. Rather, termination solely because of a parent's past violence or crime is justified only under certain enumerated circumstances, including when the parent created an unreasonable risk of serious abuse or death of a child, if the parent was convicted of felony assault resulting in the injury of one of his own children, or if the parent committed murder, attempted murder, or voluntary manslaughter of one of his own children. MCL 712A.19a(2); MCL 722.638(1) and (2). The DHS did not present any evidence suggesting that respondent had ever harmed a child. Indeed, the errors in this case are particularly troubling given that respondent's criminal history consisted largely of short jail stints for comparatively minor offenses. The record shows that he supported his family before his imprisonment and no evaluation was ever conducted to gauge whether he was likely to offend again. [*In re Mason*, 486 Mich at 165.]

This case is similar to *In re Mason* in that respondent was incarcerated and arguably complied with his case service plan as best he could while incarcerated. That is where the

similarities end, however. The children here were not placed with respondent's relatives, but with foster care homes that, luckily, were specialized to work with children who had suffered trauma. More significantly, respondent here did not provide for the children before his incarceration, and the children were forced to live in conditions so detrimental to their emotional well-being that several of them were diagnosed with PTSD, and all were in counseling.

This case is more similar to *In re Hudson*. This Court explained the underlying facts of that case as follows:

> The minor children came to the attention of the Department of Human Services (DHS) because of deplorable housing conditions and allegations of sexual abuse by respondent against her 14–year–old biological son, whom she had given up for adoption at birth but with whom she had recently reconnected. The child, A., revealed that he and respondent had engaged in sexual intercourse on numerous occasions after she located him through MySpace. The trial court asserted jurisdiction over the minor children, and the matter proceeded to hearing. Respondent ultimately pleaded guilty to one count of first-degree criminal sexual conduct, MCL 750.520b, relating to her sexual activity with A. and was sentenced to a term of nine years to 30 years in prison. The trial court thereafter terminated respondent's parental rights to her minor children. [*In re Hudson*, 294 Mich App at 263.]

This Court found that termination was appropriate under a number of grounds, including MCL 712A.19b(3)(j). On that ground, this Court explained

> Respondent's behavior had already deprived the children of several years of a normal home with her. Her ongoing denial not only turned the children against A. because they believed he was a liar, but also violated the children's trust in respondent when they came to learn more of the allegations against her. Respondent's behavior will have lifelong and profound effects on her children as they come to grips with the fact that she was guilty of first-degree criminal sexual conduct with her own 14–year–old biological child. [*In re Hudson*, 294 Mich App at 268.]

Like in *In re Hudson*, respondent's behavior here has "already deprived the children of several years of a normal home with" him. *Id.* His behavior also "will have lifelong and profound effects on [the] children . . . ." *Id.* Most importantly, like in *In re Hudson* and unlike in *In re Mason*, "incarceration was not the sole reason for termination in this case." *Id.* at 267. Accordingly, while this case is not on all-fours with *In re Hudson*, we believe that it is more analogous to *In re Hudson* than *In re Mason*.

For the reasons previously explained, respondent's rights were not terminated solely because he could not presently care for the children due to his incarceration, nor solely due to his criminal history. Rather, the trial court terminated respondent's parental rights because it found by clear and convincing evidence that there was a reasonable likelihood, based on respondent's

conduct, that the children would suffer emotional harm if returned to his care. For the reasons explained, this finding was not clearly erroneous.[3]

Affirmed.

/s/ Christopher M. Murray
/s/ Colleen A. O'Brien
/s/ James Robert Redford

---

[3] At one point in his brief on appeal, respondent seems to argue that he was not provided reasonable efforts prior to May 2020, but it is unclear the point respondent is trying to make with this argument. The children were not removed until October 2020, and defendant was not adjudicated until June 2021. Respondent does not explain why he believes that reasonable efforts were required in May 2020.